THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CLONNIE EUGENE BACK, Defendant-Appellant.

Fourth District   No. 4—92—0101

Opinion filed December 23, 1992.—Rehearing denied January 20, 1993.

46

G. Edward Murphy and Patrick W. Hayes, both of Reynolds, Murphy & Associates, P.C., of Peoria, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Norbert J. Goetten, Robert J. Biderman, and James Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

Defendant, 50-year-old Clonnie E. Back, was convicted by a Mc-Lean County jury of five counts of aggravated criminal sexual assault. (Ill. Rev. Stat. 1991, ch. 38, par. 12—14.) He was sentenced to five concurrent terms of 30 years. He appeals his conviction and sentence, arguing (1) the trial judge erred by admitting out-of-court statements made by the alleged victim of the assaults, defendant's stepdaughter, K.S.; (2) he was not proved guilty beyond a reasonable doubt; and (3) the sentence imposed was excessive. We reject defendant's arguments and affirm.

## I. OUT-OF-COURT-STATEMENTS

### A. *Reliability Hearing*

Out of the presence of the jury, the trial court held a hearing pursuant to section 115—10 of the Code of Criminal Procedure of 1963 (Code) to determine the admissibility of out-of-court statements made by K.S. about defendant's alleged assaults. (Ill. Rev. Stat. 1991, ch. 38, par. 115—10.) K.S. was born December 12, 1980. Because the State indicated K.S. would testify, the hearing focused on the time, content, and circumstances surrounding statements made by K.S. to the following people: Eric Crooks, a Department of Children and Family Services (DCFS) investigator; Bloomington police officer Michael Fazio; and Juliana Harms, a DCFS investigator.

K.S. first complained about defendant's actions to Robert Kinas, a counselor at the Institute for Human Resources in Pontiac, Illinois. At that time K.S. was nine years old. On August 7, 1990,

Kinas called a DCFS hotline and reported what DCFS terms "a risk of sexual abuse" report. Kinas did not testify at this hearing or at trial.

### 1. Crooks' Testimony

On August 10, Crooks met with K.S. Crooks began the interview by asking K.S. whether she knew why she was meeting with him. When she indicated she knew, he told her they needed to talk about Gene, the name which defendant is commonly referred to throughout the record.

When Crooks asked K.S. what defendant had done, she said defendant had kissed her and put his tongue in her mouth. She also said defendant had put his finger "down there," and had attempted to put his "thing" in down there, while she gestured toward her groin area. Crooks did not inquire about specific dates and locations of these incidents because K.S. appeared embarrassed and reluctant to talk. He did not want to traumatize her and he knew the specifics would be obtained during later police interviews with K.S. When he asked her if anything else happened, or whether there was anything else he should know, K.S. reported defendant had tried to put his "thing" in her mouth.

K.S.' mother, Kathy, was present during the interview. Because she was seated behind K.S., however, she did not coach or encourage K.S. Kathy did not insist she be present, but stated she would prefer to be there. She provided information about when she, defendant, and K.S. lived at different addresses. At the close of the interview, Crooks advised Kathy to have K.S. examined by Doctor Pamela Kidd, who is an obstetrician and gynecologist in Pontiac. He also referred the matter to the Bloomington police.

### 2. Fazio's Testimony

Fazio and Harms interviewed K.S. on September 14 and 15, 1990, at the Bloomington police station. Fazio explained the case was referred to him by DCFS, as similar cases are typically referred. He did not recall if he arranged the interview date with K.S. and her mother or if DCFS arranged it. Kathy accompanied K.S. to the station, but was not present during the interviews. Fazio asked K.S. to "tell [him] about the first time you can remember." K.S. responded that it occurred when she was living on Illinois Street in Bloomington. She thought she was four years old and possibly in kindergarten. She was playing a video game in the living

room when defendant entered and asked her to take a nap with him.

When K.S. refused, defendant grabbed her arm, removed the video controller from her hand, and dragged her into the bedroom. K.S. suffered a rug burn. Once on the bed, defendant stuck his tongue in her mouth and also stuck his penis in her mouth. When defendant went to the bathroom, she got up and returned to playing her video game. K.S. reported similar incidents occurred "almost every day." It happened so often she could not determine how many times.

The next incident K.S. reported to Fazio happened at the family residence on Magoun Street in Bloomington. Fazio elicited a description of this incident by asking K.S. to tell him about when something different happened. He explained this is his tactic when interviewing a child who has alleged numerous incidents. K.S. reported defendant pulled her into her mother's bedroom, put her on the bed, took out his "thing" and rubbed it against her "private part." She succeeded at escaping from him by jumping over the baseboard of the bed and hurting her knee. She again could not say how often this happened other than that it happened often.

The next incident K.S. described to Fazio occurred in a trailer at Southgate Estates in Bloomington. She reported defendant made her sit on a couch, and tried to put his "thing" in her mouth. Although she tried to avoid it by moving from side to side, he put it into her mouth. He then removed her pants and put his finger "up her private." When Fazio asked how she knew it was up her private, she said she could see it.

On cross-examination, Fazio denied K.S. only stated defendant put his penis into her mouth after Fazio showed her anatomically specific drawings. Fazio stated he presented K.S. with the drawings at the end of their interview. She identified what her expressions, defendant's "thing," and her "private part," represented on the drawings.

Fazio explained on cross-examination that alleged child victims are typically reinterviewed because children's threshold for answering questions is limited in the initial interview. The second interview covered the same topics discussed in the initial interview. Fazio combined his report of the two interviews.

K.S.' stories during the second interview were similar to her statements made during the initial interview with the exception that she did not mention she incurred a rug burn during the initial incident or that she hurt her knee during the second incident.

### 3. Harms' Testimony

Harms testified about her observations during the interviews. She explained she had since married Officer Fazio and was dating him when these interviews occurred. She took notes but did not directly question K.S. Harms confirmed Kathy was at the police station but was not present in the room during K.S.' interviews. She also related that when K.S. was shown the anatomically specific drawings, she circled the male penis and said that was "Gene's thing." Harms repeated similar descriptions of K.S.' accounts regarding the sexual assault incidents which K.S. had described.

On cross-examination, defense counsel questioned Harms about notations she made during the interviews. She explained the notes indicating K.S. had difficulty remembering where she lived, the first, second, third thing defendant allegedly did, and what house or room the incidents occurred in. K.S. also had difficulty specifying exact dates and times when incidents occurred. K.S. remembered the events as they stood out for her.

Defense counsel also inquired about a note stating, "[K.S.] knows Gene did something, but not sure what." Harms explained this referred to an additional incident K.S. mentioned which occurred before the initial incident for which defendant was charged.

As to the notes "no clothes ever off in Bloomington or C-worth," meaning Chatsworth, and "[n]ever tried to touch another part of her body with penis," Harms explained these were questions which she needed to clarify later. Defense counsel next questioned Harms about a notation about bringing the anatomically correct pictures and K.S. placing an "x" on a penis. Harms explained this referred to the fact K.S. was having difficulty because she was referring to defendant's "thing" and was very shy about that phrase. The drawing allowed her to clarify what she meant by marking an "x" on the penis.

Another reminder Harms wanted to clarify was indicated by the notation, "[n]othing happened in trailer except he tried to put tongue in her mouth." She further explained a final note, "[w]as never able to put penis in her mouth." Harms stated K.S. originally explained that she struggled to keep the penis from entering her mouth. K.S. said she did so by covering her mouth. She later admitted, however, the penis entered her mouth. Harms, however, had not indicated this in her notes.

Harms agreed K.S. never said defendant threatened her or said anything about the allegations. K.S. told her she did not tell anyone

about the incidents because she was afraid she would get in trouble. Defense counsel also questioned her about a note that K.S. never saw defendant's penis in her vagina. According to Harms, K.S. stated she saw defendant's finger in her vagina. Harms added the note about defendant's penis. Finally Harms was also questioned about her note that there was nothing rubbing on K.S.' private parts. K.S. had then stated that something felt it pinched real hard.

### 4. Victim's Mother's Testimony

K.S. was born December 12, 1980. Kathy testified she and defendant started living together in March 1985. Nearly the entire time they lived together, K.S. resided with them. Kathy and defendant later married. They were divorced December 5, 1990. Because defendant was not K.S.' biological father, her custody was not in issue in the dissolution proceedings. Kathy conceded the first interview with Fazio and Harms occurred three days after she received her dissolution papers. She was served the papers September 11, 1990.

She stated she was going to file for dissolution herself, but she allowed defendant to file for the dissolution because she lacked the finances. She also indicated she had not talked to K.S. about what defendant had allegedly done to her. She only told K.S. to tell the truth.

### 5. Trial Court's Ruling

At the close of the hearing, the trial judge concluded the statements K.S. made to Crooks, Fazio and Harms were admissible pursuant to the hearsay exception when the victim of a sexual act is under 13 years old. (Ill. Rev. Stat. 1991, ch. 38, par. 115—10.) He concluded the testimony established K.S.' mother had not prompted the report. He noted Kathy indicated she did not want to know the details of the allegations and she was not in a position to prompt or coach K.S. while K.S. reported the alleged assaults. Kathy's statements to Crooks and Fazio related to where she, defendant, and K.S. lived at various times, and did not include substantive statements regarding K.S.' allegations.

The trial judge reasoned questions presented to K.S. to elicit the facts of her allegations were not suggestive. He also reasoned a child is more likely to report such allegations when he or she is no longer exposed to the continuing course of conduct.

### B. *Defendant's Argument*

Defendant argues the trial court erred by admitting the out-of-court statements of K.S. which were made to Crooks, Fazio, and Harms. He contends the statements lacked sufficient reliability regarding the time, content, and circumstances in which they were made, and should not have been admitted pursuant to section 115—10 of the Code. This section provides:

"(a) In a prosecution for a sexual act perpetrated upon a child under the age of 13 *** the following evidence shall be admitted as an exception to the hearsay rule:

(1) testimony by such child of an out of court statement made by such child that he or she complained of such act to another; and

(2) testimony of an out of court statement made by such child describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual act perpetrated upon a child.

(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child either:

(A) Testifies at the proceeding; or

(B) Is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement."

Ill. Rev. Stat. 1991, ch. 38, pars. 115—10(a), (b).

At oral argument, defendant for the first time raised the argument K.S. should have been required to testify at the section 115—10 hearing. (Ill. Rev. Stat. 1991, ch. 38, par. 115—10.) Defendant also argues the statements made to Crooks, Fazio, and Harms should not have been admitted because Kinas, the first counselor who heard K.S.' allegations, did not testify about the time, content, and circumstances of his interview with K.S. Finally, defendant contends the trial court did not adequately consider the factors relevant to whether the statements were sufficiently reliable to admit them.

■ Defendant has waived review of whether the child victim must testify at the reliability hearing and whether the first person to whom the child victim reports the sexual assaults must testify at

that hearing. He failed to indicate these objections in his post-trial motion (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130; *People v. Sinnott* (1992), 226 Ill. App. 3d 923, 933, 590 N.E.2d 502, 509) or the amended post-trial motion. Although defendant did not preserve these issues for review, we will address them to provide guidance to legal professionals about the procedural requirements for reliability hearings regarding a child victim's out-of-court statements.

### C. *Analysis*

We note at the outset that the trial judge outlined the factors which led to his conclusion the safeguards of reliability had been met with regard to K.S.' out-of-court statements. (*People v. Coleman* (1990), 205 Ill. App. 3d 567, 584, 563 N.E.2d 1010, 1021.) In reviewing the trial judge's conclusion, we will not overrule his decision unless it was clearly "contrary to the manifest weight of the evidence." *People v. Zwart* (1992), 151 Ill. 2d 37, 47, 600 N.E.2d 1169, 1173; *People v. Deavers* (1991), 220 Ill. App. 3d 1057, 1069, 580 N.E.2d 1367, 1375.

### 1. Child Victim's Testimony

At oral argument, defendant argued K.S. should have been compelled to testify at the reliability hearing. The statute requires the court to conduct a hearing outside the presence of the jury to determine "that the time, content, and circumstances of the [child victim's hearsay] statement provide sufficient safeguards of reliability" *and* the child must either testify at the "proceeding" or be unavailable as a witness. Ill. Rev. Stat. 1991, ch. 38, pars. 115—10(b)(1), (b)(2)(A).

■ Defendant's argument is grounded in the presumption the "proceeding" referred to in section 115—10(b)(2)(A) means the reliability hearing. (Ill. Rev. Stat. 1991, ch. 38, par. 115—10(b)(2)(A).) According to defendant, the child victim must testify at this hearing unless he or she is unavailable. Defendant directs us to no legal support for this contention. A review of Illinois case law reveals no instances when the child was required to testify at both the reliability hearing and the trial.

We reject defendant's interpretation of "proceeding." "Proceeding," as contemplated by the legislature, and evident from the purpose of the reliability hearing, refers to trial proceedings, not the reliability hearing. The reliability hearing focuses on the timing, content and circumstances when the child victim made the state-

ments. The child's testimony at the reliability hearing is not necessary to enable the trial judge to evaluate whether there were sufficient safeguards of reliability when the statements were made.

## 2. Reliability Hearing

### a. Who Must Testify

Defendant argues *Idaho v. Wright* (1990), 497 U.S. 805, 111 L. Ed. 2d 638, 110 S. Ct. 3139, requires the testimony at the reliability hearing of the *first* recipient of the child victim's assault complaint. He contends this must occur because the State must prove the initial interview of the child did not taint later statements made by the child.

In *Wright*, the Court addressed whether hearsay statements of a child victim met particularized guarantees of trustworthiness required for admission under the confrontation clause. One of the victims was 5½ years old and raised allegations against her mother and mother's boyfriend, first to her father's girlfriend and then during an interview by a pediatrician. The other victim's statements made to the pediatrician were at issue. *Wright*, 497 U.S. at 809, 111 L. Ed. 2d at 648, 110 S. Ct. at 3143.

The doctor indicated he initially made general conversation with the child to make her feel comfortable and moved into more particularized questions. Specifically, he asked the child, " 'Do you play with daddy? Does daddy play with you? Does daddy touch you with his pee-pee? Do you touch his pee-pee?' " (*Wright*, 497 U.S. at 810, 111 L. Ed. 2d at 649, 110 S. Ct. at 3144.) The Court concluded the victim's statements made during this interview by the doctor should not have been admitted because the doctor asked leading questions. It noted corroborating evidence is not a factor in determining whether the child victim's statements should be admitted. *Wright*, 497 U.S. at 826, 111 L. Ed. 2d at 659, 110 S. Ct. at 3152; see also *Coleman*, 205 Ill. App. 3d at 581, 563 N.E.2d at 1019; *People v. West* (1992), 234 Ill. App. 3d 578, 586, 598 N.E.2d 1356, 1362.

The Court indicated the factors to be considered in determining reliability include spontaneity and consistent repetition, the declarant's mental state, use of terminology unexpected of a child of similar age, and lack of motive to fabricate. It further explained, "the unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." (*Wright*, 497 U.S. 822, 111 L. Ed. 2d at 656, 110 S. Ct. at 3150; see also *Coleman*, 205 Ill. App. 3d at 581-82,

563 N.E.2d at 1019; *West*, 234 Ill. App. 3d at 586, 598 N.E.2d at 1362.) It declined to endorse a mechanical test for determining whether such statements were particularly trustworthy, and noted trial courts retained "considerable leeway" in their determination of appropriate factors. *Wright*, 497 U.S. at 822, 111 L. Ed. 2d at 656, 110 S. Ct. at 3150; see also *Coleman*, 205 Ill. App. 3d at 581, 563 N.E.2d at 1019; *West*, 234 Ill. App. 3d at 586, 598 N.E.2d at 1362.

■ The *Wright* ruling supports a conclusion the first person to whom a child victim reports abuse to is not required, as a matter of law, to testify before other receivers of the child's out-of-court statements can be permitted to testify. The timing, content and circumstances surrounding the making of these additional statements must control in determining whether they are sufficiently reliable and therefore admissible. Although Kinas' testimony may have elucidated K.S.' additional out-of-court statements, we refuse to read into the hearsay statute (Ill. Rev. Stat. 1991, ch. 38, par. 115—10) a mandate that in each child sexual offense trial the person to whom the child *first* reports the assault *must* testify if later hearsay statements are to be admitted.

Defendant also directs us to *People v. Edwards* (1992), 224 Ill. App. 3d 1017, 1029, 586 N.E.2d 1326, 1334, in which the second district ruled a child victim's out-of-court statements were admissible because they were obtained by proper questioning. Defendant relies on the *Edwards* court's note that the victim's *initial* statement was obtained by nonleading questioning. (*Edwards*, 224 Ill. App. 3d at 1029, 586 N.E.2d at 1334.) This observation does not, however, control the court's ruling.

Moreover, an Illinois Supreme Court ruling announced after oral argument in this case provides support for our conclusion. In *Zwart* (151 Ill. 2d at 44-45, 600 N.E.2d at 1172), the court concluded, in part, that the State failed to establish the circumstances surrounding the making of the statements were reliable. In *Zwart*, none of the three adults who interviewed the victim were called to testify at the reliability hearing. (*Zwart*, 151 Ill. 2d at 44, 600 N.E.2d at 1172.) Yet the victim's mother and a therapist were permitted to testify about statements the child made to her about the sexual assaults. *Zwart*, 151 Ill. 2d at 41, 600 N.E.2d at 1170.

The *Zwart* court did not conclude *all* adults who previously interviewed the victim must testify at the hearing. Rather, it found the absence of *any* testimony about these interviews especially troubling because the victim's age made her particularly susceptible to

suggestive interview techniques which may have led her to accuse the defendant and introduced her to terminology associated with sexual activity. In addition, because the victim did not testify at trial, defendant was denied an opportunity to cross-examine her to show the interviewers used suspect techniques. *Zwart*, 151 Ill. 2d at 44-45, 600 N.E.2d at 1172.

Unlike the three-year-old victim in *Zwart*, K.S. was 10 years old. Although perhaps less susceptible to suggestion than a three year old, our ruling does not rely on this age distinction. K.S. testified at trial, providing defendant an opportunity to cross-examine her about the sexual abuse allegations. In addition, although the initial person to whom K.S. reported the sexual abuse *did not* testify at the reliability hearing, evidence was presented about the circumstances surrounding the additional statements she made to two DCFS investigators and a Bloomington police officer. Testimony by these interviewers sufficiently established K.S.' sexual abuse allegations did not arise from suggestions by others that she accuse defendant of sexual abuse nor did K.S. describe the sexual activity perpetrated against her by terminology provided to her by others. The absence of testimony by the first person to whom K.S. reported the sexual assaults was not error.

### b. State Case Law Relied on by Defendant

Defendant directed us to the appellate court ruling in *People v. Zwart* (1990), 208 Ill. App. 3d 407, 412, 567 N.E.2d 373, 376, wherein the court ruled the child's statements made to her mother were not admissible because, among additional reasons, the mother had a sexual relationship with defendant and the allegations were made only several days after the couple argued.

Defendant relies on *Zwart* for his argument K.S.' statements should not have been admitted because they were made shortly after defendant and Kathy separated. We reject defendant's contention. The Illinois Supreme Court's affirmance of this ruling is consistent with our ruling in this case. It did not rely on the relationship between the defendant and the mother of the child victim. (*Zwart*, 151 Ill. 2d at 39, 600 N.E.2d at 1170.) Unlike *Zwart*, the timing and circumstances in this case established the reliability of K.S.'s out-of-court statements.

In addition to the difficulty the *Zwart* court found with the circumstances which existed when the victim made her statements, the timing of the victim's statements to her mother about the sexual abuse was also viewed as suspect. The victim initially mentioned

the abuse five weeks after it allegedly occurred and she had previously denied abuse occurred. The court noted, as a general rule, delay in reporting abuse, or a child victim's initial denial that abuse occurred, should not automatically render the victim's statements inadmissible. It also noted child victims of sexual abuse are commonly reluctant to divulge the abuse to anyone other than their mother. *Zwart*, 151 Ill. 2d at 45-46, 600 N.E.2d at 1172-73.

However, the court concluded the timing of the victim's statements was not reliable when considering them in light of the surrounding circumstances. The victim's out-of-court statements were not proved reliable because there was *no* evidence the adults who previously interviewed the victim about the sexual abuse *did not* use suggestive interview techniques. (*Zwart*, 151 Ill. 2d at 44-45, 600 N.E.2d at 1172.) In this case, the State's introduction of testimony by Harms, Fazio, and Crooks overcomes the difficulties presented in *Zwart*.

Defendant also argues we should be persuaded by the third district's ruling in *People v. Anderson* (1992), 225 Ill. App. 3d 636, 648, 587 N.E.2d 1050, 1059, wherein the court notes it may in the future grant a defendant a new trial if the evidence is closely balanced and the testimony about the child victim's hearsay statements is cumulative.

The testimony presented by the State was not cumulative. Moreover, although Harms and Fazio testified about the same interviews with K.S., we note defendant called Harms as a witness at trial. He cannot now complain her testimony prejudiced him.

### 3. Content, Timing, and Circumstances

Contrary to defendant's contention, a review of the testimony at the hearing establishes K.S.' statements to Crooks, Fazio, and Harms were reliable. In evaluating the admission of statements made by K.S. to the three witnesses, we consider the totality of the circumstances surrounding the making of these statements. (*Coleman*, 205 Ill. App. 3d at 584, 563 N.E.2d at 1021; *People v. Booker* (1992), 224 Ill. App. 3d 542, 554, 585 N.E.2d 1274, 1283.) Unlike defendant's arguments in his brief, which contain references to trial testimony, we focus *only* on the evidence presented at the hearing to determine the admissibility of these statements.

The fact Kathy and defendant were recently separated when K.S. raised the allegations does not significantly detract from the trustworthy circumstances surrounding K.S.' statements to Crooks, Fazio, and Harms. K.S. first raised the allegations to Kinas

in early August 1990. Kathy could not recall if she was present when K.S. raised the allegation to Kinas. Defendant contends this suggests dishonesty on the part of Kathy. He suggests K.S. invented the allegations upon prompting by Kathy or because K.S. was distraught over his departure.

However, Kathy also testified at the hearing that she suspected improper conduct was occurring between defendant and K.S. Her inability to recall whether she was in the room when K.S. divulged the allegations does not make K.S.' statements to Crooks, or to Fazio and Harms, suspect. Whether she was in the room when the allegations were divulged does not detract from the circumstances surrounding the statements K.S. made to Crooks, or to Fazio and Harms.

Defendant also points to Crooks' testimony that Kathy told him K.S. told her defendant inserted his finger into K.S.' vagina when they lived in Bloomington. He contends this contradicts Kathy's testimony that she did not know about K.S.' allegations until K.S. divulged them to Kinas and suggests Kathy had K.S. raise the allegations. Although inconsistent with Kathy's testimony, this does not defeat the trustworthiness of K.S.' statements when viewing all evidence presented at the hearing.

In addition, the timing of K.S.' allegations does not detract from the trustworthiness of her statements to Crooks or to Fazio and Harms. She initially made the allegations against defendant within a few months after he moved from their residence. Her fear of reporting the incidents because she would get into trouble dissipated when she was no longer confronted daily by the perpetrator of the assaults, an adult who had authority over her.

### 4. Crooks' Testimony

Defendant argues Crooks' testimony should not have been admitted because he obtained most of his information from K.S.' mother and not from K.S. The record does not support this argument. Kathy provided information about where she, defendant, and K.S. had lived at relevant times, but did not provide substantive information about K.S.' allegations. Defendant also argues this testimony was inadmissible because Crooks had preconceived notions about what K.S. would say and because he used leading questions to elicit the information from K.S. No testimony at the hearing suggests Crooks knew what K.S. would tell him. He asked K.S. to tell him what defendant had done to her. She responded by telling him

defendant kissed her, put his tongue in her mouth, put his finger "down there," and attempted to put his "thing" in down there.

The content, timing, and circumstances of Crooks' interview established K.S.' statements were particularly reliable. Crooks' initial question is distinct from the leading questions involved in *Wright* where the pediatrician asked the child, among other leading questions, whether "[d]addy touch[ed] [her] with his pee-pee." (*Wright,* 497 U.S. at 810, 111 L. Ed. 2d at 649, 110 S. Ct. at 3144.) Asking K.S. what her stepfather had done to her provides no suggestion K.S. should allege defendant assaulted her.

The language K.S. used while talking with Crooks also supports the trial court's conclusion that the content of the interview was particularly reliable. She used descriptions of her vaginal area and defendant's penis which a 10-year-old child might commonly use. She clearly was not versed in the terminology of male and female sexual organs.

Crooks testified K.S. did not provide specifics to him about when or where the incidents occurred. He explained he did not ask K.S. about details because he noted she was nervous. She was flushed and seemed embarrassed to be talking to him. She was sharing experiences which were understandably frightening and embarrassing to a child not yet 10 years old. Speaking with Crooks was difficult. Crooks felt it was unnecessary to obtain these details from K.S. because he knew the police would ask her about these details when they interviewed K.S.

K.S.' mother was present during the interview, but was seated behind K.S. She did not coach K.S. during the interview. Kathy testified defendant moved out of their home in May 1990. Nothing about the circumstances surrounding K.S.' statements during Crooks' interview suggests these statements should have been excluded.

### 5. Fazio's Testimony

Defendant argues Fazio's testimony should have been excluded because he had a preconceived notion of K.S.' allegations. He directs us to Crooks' testimony that he sent his reports to Fazio. Fazio denied receiving the reports. It is possible Crooks sent the reports and Fazio did not receive them. Even if Fazio reviewed the reports, his questioning establishes any preconceived notion he may have had did not influence the way he questioned K.S. His testimony at the hearing established he did not use leading questions. Rather, he initially asked K.S. to tell him about what she talked to

Crooks and her counselor about. This question did not suggest specific detail to K.S. from which she would know how to respond. During the interview, Fazio obtained additional information from K.S. by asking her to tell him about what she remembered next happened which was different. This question, too, lacks the type of suggestion which would defeat a particularly trustworthy response from the child victim.

Defendant also contends Fazio had preconceived notions because he initially spoke with Kathy about the incidents. Fazio testified he obtained only information about where Kathy, defendant, and K.S. lived during relevant periods. Defendant presented no evidence to the contrary. In addition, Kathy was not present during the interviews with K.S. Her absence precludes defendant from successfully arguing her presence may have influenced K.S.

Defendant tried to establish that Fazio showed K.S. the anatomical drawings before the end of the interview. The timing of this presentation, defendant seems to argue, caused K.S. to state, for the first time, that defendant had put his penis in her mouth. Fazio denied presenting the drawings to her before the end of the interview. Harms also stated the drawings were presented at the end of the interview.

The trier of fact is in the best position to evaluate the believability of witnesses. Its resolution of disputed questions of fact is entitled to great deference on review. (*People v. McCarthy* (1991), 213 Ill. App. 3d 873, 880, 572 N.E.2d 1219, 1223-24; *People v. Jones* (1988), 174 Ill. App. 3d 737, 745, 528 N.E.2d 1363, 1369.) Fazio's presentation of the drawings did not suggest K.S. should say defendant put his penis in her mouth. Even if Fazio had presented the drawings earlier in the interview, we would not be compelled to conclude this created suggestive interviewing techniques.

Defendant complains about Fazio's destruction of his notes and Fazio's testimony he did not recall specific questions asked at the second interview. He also complains of Fazio's indication that Harms took all the notes, and he had her notes when he wrote his reports but he did not use them in making his report.

The Illinois Supreme Court has recently ruled an investigator's handwritten notes taken while interviewing a child victim of sexual assault are discoverable pursuant to Rule 412(a)(i) if they are not destroyed. However, where the substance of the notes is contained in a police report available to defendant, the rule is satisfied and defendant suffers no prejudice. (*People v. Wittenmyer* (1992), 151 Ill. 2d 175, 189, 601 N.E.2d 735, 741-42; 134 Ill. 2d R. 412(a)(i).)

Defendant in this case suffered no prejudice from Fazio's destruction of his notes.

Moreover, Fazio is a trained interviewer of child victims of sexual assault. He has investigated 200 child sexual assault cases. He testified questions at the second interview were limited because he explained to K.S. they were going to go over what they discussed in the initial interview. He proceeded by asking her to tell him about the incidents that occurred when she lived on Illinois Street, Magoun Street, and the trailer park. This sufficiently established Fazio did not modify his interviewing strategies. It was this technique which he regularly used when interviewing child victims. Defendant did not present evidence to establish Fazio used Harms' notes in writing his report. None of defendant's contentions present suggestive interviewing by Fazio which defeated the particularly trustworthy nature of K.S.' statements to him during the September 14 and 15 interviews.

The descriptive terms used by K.S. during the interviews also suggest the content of these interviews was trustworthy. Again, K.S. described defendant's penis as his "thing" and her vaginal area as her "private part." These terms are indicative of a young girl not versed in the nomenclature of bodily organs.

### 6. Harms' Testimony

Defendant argues Harms' testimony should not have been admitted because it was fraught with inconsistencies. Harms confirmed Kathy was at the police station during the interviews but was not present during the interviews. She described K.S.' statements about defendant's illegal conduct similar to what Fazio stated at the hearing. Defense counsel questioned Harms about notations she made during the interviews, such as, "no clothes ever off in Bloomington or C-worth." Harms explained the notations which defense counsel inquired about were not statements made by K.S., but were Harms' thoughts about things she still had questions about. She also explained a notation, "[K.S] knows Gene did something, but not sure what." This referred to an additional incident which K.S. mentioned, but for which defendant was not charged.

Although Harms' notes may have raised questions about which notations represented statements by K.S. and which notations were merely Harms' thoughts, the trial judge's decision to admit her testimony was not contrary to the manifest weight of the evidence. (*Deavers*, 220 Ill. App. 3d at 1069, 580 N.E.2d at 1375.) In the future, it would be preferable if DCFS investigators organized their

notes more professionally. Harms should have noted the distinctions within her notes about which statements were the victim's and which statements were additional questions.

### 7. Admissibility of Statements

The trial judge correctly concluded K.S.' out-of-court statements made to Crooks, Fazio, and Harms were admissible. The evidence presented at the hearing established these statements were particularly trustworthy. The trial judge did not err by admitting them.

## II. REASONABLE DOUBT

Defendant's next contention, that he was not proved guilty beyond a reasonable doubt, requires a review of the evidence presented at trial.

### A. *The State's Case*

#### 1. Investigator's Testimony

The jury trial began on December 10, 1991. Defense counsel objected to admission of the out-of-court statements. The objection was noted but overruled. Crooks was the State's first witness. Crooks had worked at DCFS for 13 years and had investigated child abuse and neglect reports for 8½ years. The initial report regarding K.S. was received by DCFS August 7, 1990, and was made by Robert Kinas of the Institute for Human Resources, Pontiac, Illinois. Crooks met with Kathy and K.S. August 10. He initially interviewed Kathy without K.S. present. While he interviewed K.S., Kathy was present but was seated behind K.S.

Kathy only participated in the interview with Crooks and K.S. to provide addresses and dates when she, K.S., and defendant resided at various locations. K.S. was unable to provide this information. Crooks described how he initiated the interview with K.S. He told her he wanted to talk to her about Gene and asked her what Gene had done.

K.S. told him defendant had kissed her and put his tongue in her mouth. She also stated defendant put his finger inside, down there, while she gestured to her groin area. She also told him "[defendant] had tried to put his thing in down there," while she again gestured toward her groin area. During the interview, Crooks noted Kathy did not coach K.S.

K.S. also told him defendant would take her by the arm into the bedroom and he would lie on top of her. During these incidents,

K.S. reported she and defendant were clothed. Crooks did not recall questioning K.S. about how many incidents occurred between her and defendant. Crooks indicated the interview with K.S. was difficult. He thought this was because she was embarrassed and was forcing herself to talk to him. He perceived her as feeling threatened because she did not know him. He also noted she was flushed during the interview.

Crooks testified he did not put words into K.S.' mouth and he noted she used her own terminology for pertinent body parts. She referred to defendant's penis as his "thing" and her vaginal area as "down there." The interview lasted approximately 30 minutes. He suggested to Kathy that K.S. be examined by Kidd. He also told Kathy he would report the incident to the Bloomington police department, which he later did.

On cross-examination, Crooks stated he thought he had photocopied his notes regarding his interview with K.S. and Kathy and took them to the Bloomington police department for Officer Fazio, whom he had spoken to when he reported the case to the police department.

### 2. Police Officer's Testimony

Fazio was the State's next witness. He works in the sex investigation unit and has investigated such cases for nearly two years. He has investigated approximately 200 cases involving children. He was contacted by Crooks about K.S.' alleged abuse and interviewed K.S. September 14 and 15, 1990. During these interviews Kathy was not present in the room. He first interviewed Kathy outside the presence of K.S. During all interviews Harms was also present.

Fazio described how he initiated conversation with K.S. He initially asks the child victims if they know why they are there to talk to him. When K.S. responded no, he asked her to tell him what she "talked to [her] counselor or Eric Crooks about." K.S. replied that, "Gene goes up and down on me." Fazio then asked her to tell him about the first incident that she could remember. He would let her bring up the incident and would then build off her statements.

K.S. told him the first time she remembered something happening she was living on Illinois Street. She was playing a video game when defendant asked her to take a nap with him. When she refused, defendant yanked the controller from her, grabbed her arm, and dragged her into the bedroom. She told Fazio she got a rug burn while defendant was dragging her. Defendant put her on the bed, "put his tongue in her mouth, and then tried to put his

thing in her mouth." She turned her head, but he finally accomplished putting his "thing" in her mouth. When defendant got up to go to the bathroom she returned to playing the video game.

After K.S. described this initial incident, he asked her how often this occurred. She said it occurred nearly every day. When he asked her how many times it occurred, she responded so often she did not know. Fazio then asked K.S. to tell him about when something different happened. She described an incident which occurred on Magoun Street. Defendant pulled her into her mother's bedroom. He rubbed his thing on her private spot and she tried to get away. He pulled her back. He tried to take her clothing off, but did not succeed. She injured her knee when she tried to jump off the end of the bed. She did not know how often this occurred, but said it happened a lot. Fazio did not ask her whether defendant was clothed during this incident.

When Fazio asked K.S. to describe the next time she remembered when something different happened, she remembered living in a trailer when it occurred. Defendant put her on the couch and tried to put his "thing" in her mouth. She again tried to avoid it, but he succeeded. She said defendant took off her pants and put his finger up her "private." When he asked her how she knew this had occurred, she explained that she saw it. When he asked her how often this happened, she again responded that it happened often.

Fazio interviewed K.S. again September 15. He indicated the purpose of reinterviewing a child victim is because a child's mind wanders. The second interview can determine whether their initial stories were rehearsed. He explained that when a child fabricates a story during the initial interview, his or her descriptions during the second interview are generally verbatim from the initial interview. During the second interview, K.S. did not mention the rug burn or the injury to her knee. Fazio stated K.S. had not recalled "the spontaneous thing—oh, this is where I got the rug burn—and the time where she injured her knee jumping off the end of the bed."

Fazio stated he did not use leading questions when interviewing K.S. He began by asking her what she talked about with her counselor or Crooks. He did not know what her conversations with these individuals were because, he stated, he does not receive their reports. The reports, he explained, are confidential to the DCFS hotline.

At the close of his interview, Fazio presented K.S. with anatomically specific drawings and asked K.S. to circle the body part rep-

resenting defendant's "thing" and the one which represented her "private part."

During cross-examination, Fazio denied he showed K.S. the anatomically specific drawings before she mentioned defendant put his penis into her mouth. He did not recall K.S. stating during the initial interview that defendant did something, but she was not sure what. He did not recall her stating that during the initial incident at Illinois Street defendant tried to put his penis into her mouth but she covered her mouth with her hands. He also did not recall her saying she never saw defendant's penis because she closed her eyes. He believed she stated that during one incident she closed her eyes. He also did not remember K.S. telling them that during an incident at Southgate Estates she felt pain, like somebody was pinching her real hard.

Fazio did not discuss Harms' notes before writing his report. He prepared his reports from his notes and what he recalled about K.S.' interviews. He prepared his report September 19, 1990.

### 3. Medical Testimony

Doctor Kidd testified next, out of order, on behalf of defendant. She had examined K.S. on August 27, 1990. Kathy was present during the exam. K.S. initially said she did not know why she was at Kidd's office. Kathy said she was there to be evaluated for sexual molestation. When Kidd asked K.S. when she was molested, she did not remember. K.S. was chewing on her T-shirt. Kidd left the room for a few moments while K.S. was undressing. Kathy remained in the room with K.S.

When Kidd returned and began performing the exam, K.S. told her she had been molested by her stepfather twice when she was nine. K.S. said defendant took her pants off and pushed his finger in her vaginal area. She asked K.S. to illustrate, by pushing on the doctor's hand, how much pressure defendant put in that area. Although Kidd did not indicate in her notes the amount of pressure K.S. illustrated, she stated she recalled not being impressed by the amount of pressure.

Kidd placed her finger near K.S.' vaginal opening and asked K.S. if defendant touched her in that area. K.S. indicated defendant's finger did not enter her vagina, rather she only indicated defendant touched near the vagina. K.S. also told Kidd defendant tried to put his penis into her mouth but she had turned her head away. Kidd's examination concluded K.S. had no evidence of trauma or scarring, which would be caused by penile or digital penetration.

On cross-examination, Kidd stated penile penetration in a girl K.S.' age would have caused trauma. She conceded it was possible for penetration by an adult male finger to have occurred without causing trauma. Force or numerous occurrences would cause trauma.

### 4. Victim's Mother's Testimony

Kathy was the State's next witness. She testified K.S. was born December 20, 1980, and defendant's date of birth was April 5, 1941 or 1942. She, defendant, and K.S. resided at three different locations in McLean County from March 1985 through July 1989. They lived on Illinois Street in Bloomington with Kathy's son (who is recently deceased) and defendant's mother from March 1985 until June 1987. There were periods between August 1986 and June 1987 when the three did not live together. On cross-examination, Kathy stated defendant did not reside with her and K.S. for approximately three months in 1986; and for several months before June 1987, Kathy attended school in Tennessee and K.S. lived with Kathy's mother. During this period, defendant would pick K.S. up for weekend visits.

In June, they relocated to a home on Magoun Street in Bloomington and resided there until January 1988. In January 1988, they purchased a trailer in Southgate Estates and relocated there. In July 1989, they lived with her mother for approximately a month after they sold their trailer. They then relocated to Chatsworth, Illinois. She and defendant separated in May 1990, and were divorced on December 5, 1990.

In March 1990, she sought counseling from Kinas. Defendant had agreed to attend sessions, but missed two appointments. K.S. also began receiving counseling from Kinas. K.S. made her allegation to Kinas shortly after defendant moved from their home. Upon inquiry by the trial judge, Kathy stated she could not recall if she was in the counseling session when K.S. initially told Kinas about her allegations. K.S.' report to Kinas was the first time she raised these allegations.

Kathy testified defendant and K.S. were often left alone. She observed unusual occurrences between defendant and K.S. while they lived together in Chatsworth. In late February or early March 1990, she saw K.S. and defendant exiting the bed when she returned home. She heard the covers ruffling and asked what was happening. K.S. stared up at the ceiling. Defendant exited the bed and said something to K.S. Defendant was clothed in only sweat-

pant shorts. Kathy noted he had an erection. Kathy also testified she noted potentially questionable activity between defendant and K.S. while they lived at Illinois Street, Magoun Street, and Southgate Estates. These occurrences happened more than 20 times and consisted of defendant and K.S. seemingly rushing to put themselves together when Kathy would return home.

Kathy also testified defendant insisted on K.S. sleeping with them and on his side of the bed. On one occasion when Kathy suspected she and defendant were having marital difficulties, she asked him if he was in love with another woman. He responded he was and it was K.S.

She testified she at no time told K.S. what to say regarding these incidents. She did not initially report K.S.' allegations nor try to discuss them with K.S. K.S. began talking to her about what occurred after Kathy enrolled her in counselling sessions for children that had been molested. Kathy merely allowed K.S. to talk. She also testified she did not discuss the specifics of K.S.' allegation before any of the interviews conducted with K.S. leading to the charges being filed against defendant.

On cross-examination, Kathy denied trying to reconcile her marriage with defendant. She never told him after he was charged in this case that charges would be dropped if he could come back to her. She explained there would have been no reconciliation because DCFS had informed her if she lived with defendant, her children would be taken away. She conceded she was served with defendant's dissolution papers on September 11, 1990.

### 5. Victim's Testimony

K.S. was the State's next witness. She stated she was left alone with defendant often while they lived at the Illinois Street address and less frequently when they lived on Magoun Street. She testified that the first unusual occurrence she remembered which occurred while they lived at the Illinois Street address was when defendant "went up and down on [her]." This happened in her mother's bed. She responded "no" when asked if she could explain what she meant by "he went up and down on [her]." They were clothed. His body was pressing against her. Defendant perpetrated this act on K.S. "more than once." She also testified that while they lived at that address, defendant "put his private in [her] mouth." When asked what she meant by his "private" she said "his penis." She stated it happened "more than once" and "all the time," but could not state about how often this occurred. K.S. stated that during the

first incident when defendant went up and down on her, they were both clothed.

The State asked her if there were occasions when someone would have his or her clothes off. She responded yes. The State asked who had their clothes off during these incidents. She responded defendant did. She could not remember if she was clothed.

The State asked her if she recalled occasions at Magoun Street when defendant put his penis in her mouth. K.S. stated she did and that it occurred "all the time." K.S. agreed with the descriptions of incidents which occurred at the Magoun Street address. Defendant would "go up and down" on her almost all the time. She could not remember whether defendant or she was clothed.

She described what she remembered happening while they lived at Southgate Estates. Defendant "went up and down on [her] and put his private in [her] mouth." He perpetrated these acts on K.S. "a lot of times." The State asked K.S. whether defendant touched her private areas while they lived at Southgate Estates. She said yes, but did not know what he touched it with. She did not know if during any of these occurrences she felt uncomfortable or had any discomfort.

The State asked if at any of the three locations, defendant ever touched her in her private areas with his hand or fingers. She said he had while they resided at Southgate. This happened more than one time but she did not remember how he touched her. The State asked whether he did this with his hand or finger. K.S. responded, defendant "sticked up my private." She felt his hand there and saw it there. She could not remember if she was clothed during these incidents.

The State next asked whether, during the times defendant would go up and down on her, K.S. felt his penis touching her private area. She responded yes. The State asked whether, when this occurred, she could feel his skin touch her skin. She responded yes. She did not know why she used the term "going up and down," but it was her term and no one told her to use it. She said she did not know what it meant. K.S. explained she had not told her mother about defendant's actions because she was afraid.

On cross-examination, K.S. said she thought she and her mother talked about what she would say to Crooks while they travelled to the DCFS office. In response to defense counsel asking her whether they talked about this during the entire trip to the office, K.S. said she thought so. Defense counsel said having her mother sitting be-

hind her at Crooks' office must have made her uncomfortable. K.S. said yes.

When defense counsel asked her if she did or did not remember what she told Crooks, she said she did not know. However, when asked specifically, she remembered telling Crooks defendant had put his tongue in her mouth and his finger in her private. When asked, she said she remembered telling Crooks defendant tried to put his private into her private. She thought she and her mother talked about what she had told Crooks while they drove back to Chatsworth.

K.S. was asked the following questions posed by the defense counsel: had she told Kidd defendant touched her on her private and had she told Kidd that she turned her head away and defendant's penis did not enter her mouth; K.S. in each case responded that she thought so.

In response to questioning by defense counsel, K.S. said she remembered telling Harms defendant had done something but that she was not sure what he had done. When asked whether it was right after Fazio showed her the anatomically specific pictures that she told him defendant had put his penis in her mouth, she said she thought so.

She did not remember telling Fazio and Harms that she did not see his penis or that when defendant went up and down on her he always had his clothes on. She also did not remember saying defendant tried to take her clothes off but she would not let him. She thought she remembered telling them defendant put his penis in her mouth, but did not know whether she told them defendant was not able to put his penis in her mouth because she covered her mouth with her hands. She also did not remember telling them she did not see defendant's penis because she kept her eyes closed or that when defendant went up and down on her he did not touch any other part of his body to her "private."

She thought she remembered telling them defendant put his finger up her private when they lived at Southgate Estates, but did not remember telling them it hurt and felt like somebody was pinching her bad. She also did not remember telling them she saw defendant's finger go up her vagina.

She denied telling anyone her accusations were not true and that her mother made her allege the accusations. K.S. said she reviewed notes with the State's Attorney and with her mother before she testified. She and her mother had not discussed her testimony the night before. On redirect examination, K.S. stated no one told

her to lie about anything before she came into court to testify. On re-cross-examination, K.S. stated she read the notes before testifying. Her mother did not read them to her. She was reading them immediately before coming in to testify.

## B. *Defendant's Case*

### 1. Mehlberg's Testimony

Defendant's first witness was Deborah E. Mehlberg. She testified to defendant's reputation for having a fine moral character. Kathy's reputation for the same was bad. She also stated when she asked K.S. if she knew about the allegations against defendant which Kathy was lodging, K.S. seemed dumbfounded and said she knew nothing about them. This conversation allegedly occurred before defendant was indicted. She had an additional conversation with K.S. after defendant was indicted during which K.S. allegedly said her mother was making her accuse defendant because Kathy was mad at defendant. Mehlberg also testified K.S. said she was afraid of getting beat up by her mother. Mehlberg reportedly called DCFS to report that Kathy's son said he was beaten up by Kathy and to tell them the children were being left alone. She did not, however, report what K.S. allegedly told her. Mehlberg was defendant's niece. Later in the proceedings, the jury was informed this witness had not been disclosed until the day of the trial.

### 2. Harms' Testimony

Harms was defendant's next witness. She had been a DCFS investigator since July 1989. In November 1990, she married Fazio. When the two interviewed K.S., they were dating. Defense counsel questioned Harms about notes she took during the interviews with K.S. Harms stated Kathy was not present during the interviews of K.S. Fazio questioned K.S. Harms indicated Fazio initiated the interview by asking K.S. if she knew why she was at the police station. When K.S. said she did not know, Fazio asked K.S. if she could tell him what she had told Crooks and her counselor. K.S. responded that defendant "went up and down on her."

K.S. had difficulty remembering what had occurred the first time on Illinois Street. She recalled what stood out in her mind. She could not remember what defendant did. She later said defendant had asked her to nap with him and she refused. It was Harms' recollection that no clothes were removed during this incident. K.S. tried to escape from defendant.

Harms testified the anatomical drawings were used after K.S. described all the incidents. K.S. had already talked about defendant putting his "thing" in her mouth. Despite defendant's countercontention, Harms recalled stating the same order at the hearing held the previous day. Defense counsel presented Harms' notes, which referred to Fazio bringing out the anatomically correct drawings before her notes referred to K.S. talking about defendant putting his penis in her mouth.

Harms recalled Fazio asking K.S. what happened next. K.S. related an incident when she lived on Magoun Street. Defendant grabbed her and put her on the bed. He got on top of her and was rubbing up and down on top of her. K.S. tried to get away from defendant. He tugged at her clothes. His "thing" was rubbing on her private. She escaped once, but he grabbed her and put her back on the bed. She got away again. She caught her leg, and had hurt her knee, but she was able to escape.

Defense counsel asked Harms about her notation that K.S. stated defendant was never able to put his penis into her mouth because she covered her mouth. He tried to move her hands. Harms explained K.S. had earlier indicated this scenario, but later admitted defendant put his penis into her mouth. When asked what K.S. said about defendant's penis, Harms replied that K.S. stated she never saw his penis because she kept her eyes closed.

Harms testified that, when describing the incident in her mother's bedroom at Magoun Street, K.S. did not mention defendant's hands touching any other part of her body. K.S. was next asked by Fazio to describe the next incident she remembered. K.S. described an incident which occurred at Southgate Estates where defendant put her on the couch, took off her pants and tried to put his "thing" in her mouth. K.S. also said defendant inserted his finger into her "private." Defense counsel inquired about how many times K.S. said defendant put his finger into her vagina. Harms recalled K.S. estimated this occurred three times.

K.S. told them she had not told her mother or brother about defendant's actions because she was afraid she would get into trouble for what was happening. Fazio next asked her how she knew defendant's finger had been in her vagina and she said she knew because she could see it. K.S. next described an incident at Southgate Estates when defendant "went up and down on her." K.S. said this hurt and it felt like somebody pinched her real hard.

Harms did not recall K.S. ever relating that defendant's penis entered her vagina. According to Harms, at the second interview

K.S. described the incidents in a way similar to how she described them during the first interview.

### 3. Character Witnesses

Additional character witnesses testified on behalf of defendant. Each expressed the view that defendant's reputation for honesty and morality was good while Kathy's was not. Star Lynn Burden stated such. Her boyfriend played in defendant's band periodically. Paul Simmons testified along the same lines; defendant was his uncle. Burden and Simmons also testified they each lived with defendant, K.S., and Kathy at different periods and did not observe any improper conduct. In addition, Debra Davis opined that Kathy's reputation for honesty was not good. Defendant's current girlfriend, Brenda Marriott, also testified on his behalf. She related a conversation she previously had with Kathy during which Kathy allegedly indicated there would be charges filed against defendant. On cross-examination, Marriott conceded Kathy had not said charges would be filed unless defendant acted in accordance with particular instructions. Kathy had merely stated that charges would be filed against defendant.

Kathy Whittier testified she had known defendant, Kathy, and K.S. about three years. She would see them once or twice a month in the summers. She opined that K.S. and defendant had a father-daughter relationship. She had not seen K.S. act frightened of defendant. He treated K.S. calmly and they had an open relationship. She also stated defendant's reputation for being moral was high. Kathy's reputation for the same was not good. On cross-examination, Whittier divulged that her boyfriend was a lifetime friend of defendant. Her boyfriend and defendant socialized together.

### 4. Defendant's Testimony

Defendant testified that when he resided on Illinois Street with Kathy, K.S. lived elsewhere, most of the time with her grandmother, Donna Bell. They lived on Illinois Street for approximately one year. They moved from there in July 1986, and relocated to University Court in Normal, Illinois. Defendant stayed there one month and Kathy resided there three months. Defendant moved to Cooksville, Illinois, and resided with his ex-wife. He lived with her until February 1987. While living in Cooksville, defendant only visited with K.S. once at the grandmother's house for approximately one hour. K.S.' grandmother and her grandmother's husband were present during defendant's entire visit with K.S.

In February 1987, defendant went to Tennessee, where Kathy was attending school. They lived there together until June 1987. When they returned, they stayed temporarily with defendant's mother and with his sister. They moved into their Magoun Street address sometime that month. Defendant contended that although K.S. moved in with them a month later, she was present only periodically because she stayed at her grandmother's a lot or her father picked her up for weekends. She was gone at least once a week.

They relocated to Southgate Estates in spring or fall 1988, and resided there until they moved to Chatsworth in late 1989 or 1990. He and Kathy separated in May 1990. This decision was shared. He denied trying to reconcile with Kathy between the separation and their dissolution. He decided to seek the dissolution in June 1990. Defendant testified Kathy made several attempts to reconcile their relationship.

Defendant testified K.S. slept with her brother until she was seven or eight years old and her brother was 12 years old. K.S. had her own bedroom but she refused to sleep in it because she was frightened. When they moved to Chatsworth she began sleeping in the bedroom defendant and Kathy slept in. She slept on a pallet in their room with a sleeping bag. At times she slept in the bed with them. Most often when this occurred, she would sleep on Kathy's side of the bed, but sometimes she slept on defendant's side of the bed. The pallet was located on defendant's side of the bed because the other side was placed up against the wall.

Defendant described an incident which occurred after they moved to Chatsworth. He took a nap. When he awoke K.S. was in bed with him. Kathy entered the room and woke defendant. He had no idea how Kathy could have seen him with an erection when he exited the bed. He denied any questionable occurrences between him and K.S. He explained only that at times he would lie on the couch to watch TV and K.S. would lie beside him. K.S. was always fully dressed. Defendant denied all allegations raised by the State's case.

### C. *Analysis*

Defendant was charged with five counts of aggravated criminal sexual assault pursuant to section 12—14 of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 12—14). Generally, it was alleged that at various times and locations from March 1985 through July 1989 defendant, at a time when he was over age 17 and when K.S. was under age 13, sexually penetrated K.S.' mouth and/or va-

gina with his penis and/or finger. Section 12—14(b)(1) provides, "[t]he accused commits aggravated criminal sexual assault if:" "the accused was 17 years of age or over and commits an act of sexual penetration with a victim who was under 13 years of age when the act was committed." Ill. Rev. Stat. 1989, ch. 38, par. 12—14(b)(1).

The standard for reviewing whether defendant was proved guilty beyond a reasonable doubt is whether, after viewing the evidence most favorably toward the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Wittenmyer*, 151 Ill. 2d at 190, 601 N.E.2d at 742; *People v. Nitz* (1991), 143 Ill. 2d 82, 95-96, 572 N.E.2d 895, 900-01; *People v. James* (1990), 200 Ill. App. 3d 380, 395, 558 N.E.2d 732, 742.) The evidence established during all relevant times defendant was over 17 years old and K.S. was under 13 years old. Defendant argues K.S.' testimony was so unreliable that no rational trier of fact could have concluded he was guilty of any of the charges of which he was convicted.

### 1. Counts I and II

Count I alleged that between January 1, 1988, and July 1989 defendant sexually penetrated the mouth of K.S. with his penis. Count II alleged that between January 1, 1988, and July 1989 defendant sexually penetrated K.S.' vagina with his finger. During this period, defendant, Kathy, and K.S. lived in a trailer in Southgate Estates in Bloomington, Illinois.

K.S. testified that while they lived at Southgate Estates, defendant put his "private in [her] mouth *** a lot of times." She also said defendant stuck either his hand or fingers "up her private" while they lived at that address. She felt his hand there and saw it there.

■ The testimony of Crooks, Fazio, and Harms supported K.S.' allegations that defendant sexually penetrated her mouth with his penis and digitally penetrated her vagina. Fazio and Harms recounted K.S.' description of an incident which occurred while she lived at Southgate Estates.

During their interview of her, K.S. told them that while she lived at Southgate Estates, defendant tried to put his "thing" in her mouth. She tried to avoid it, but could not. She also told them defendant put her on the couch, took off her pants and put his finger up her "private." She related these incidents during the September 14 and 15 interviews.

In addition, Crooks recounted an incident described by K.S. when defendant "put his finger inside, down there." Crooks did not question K.S. about particular times or dates incidents occurred. He knew the police interviews would clarify the specifics. Although his testimony did not prove the incident K.S. related had occurred while they lived at Southgate Estates, it is consistent with K.S.' later statement to Fazio and Harms about the incidents at Southgate Estate. The primary difference in her later account to Fazio is that she provided more detail than she did in her earlier interview with Crooks.

Defendant directs us to K.S.' failure to describe these incidents similarly to Kidd. Although defendant states in his brief that the State relied heavily on Kidd's testimony to corroborate K.S.' testimony that defendant digitally penetrated her, Kidd was a defense witness. Defendant relies heavily on Kidd's testimony in his effort to show the allegations of digital penetration of K.S.' vagina were not sufficiently proved.

Defendant directs us to Kidd's testimony that K.S. initially told her she forgot who molested her. During her examination, K.S. told Kidd defendant took her pants off and touched her vagina. K.S. said this occurred twice when she was nine years old. K.S. did not relate other assault incidents to Kidd. Kidd testified K.S. chewed her shirt while Kidd spoke to her. This reveals a child most uncomfortable in her surroundings and it could explain K.S.' hesitancy to speak with Kidd about what had occurred.

Defendant also argues he could not be convicted of count II because he did not live in McLean County with K.S. after she turned nine years old. He contends the record reveals he, Kathy, and K.S. relocated to Chatsworth in July 1989, before K.S. turned nine in December 1989. Defendant testified only that they moved to Chatsworth in 1989 or 1990. However, Kathy's testimony supports the contention that defendant, she, and K.S. moved to Chatsworth before K.S. turned nine years old.

However, testimony by Crooks, Fazio, and Harms supports K.S.' allegation. In her statements to them, she did not say she was nine years old. She said this incident occurred while she lived in Southgate Estates with defendant. It is more realistic to conclude a child will remember where she lived when such an incident occurred than it is to conclude she would remember her exact age when the incident occurred. Her statement to Kidd, although not entirely consistent with her other statements, sufficiently shows defendant penetrated her vagina with his finger.

Kidd opined K.S. had not been digitally or penilely penetrated because there was no evidence of trauma or scarring to K.S.' vagina. She conceded on cross-examination, however, that penetration by an adult male's finger could occur without trauma present in the vagina. Kidd testified she remembered not being impressed with the amount of force K.S. indicated defendant used with his finger. She did not, however, indicate this in her notes; rather, she testified from her memory of K.S.' examination, which had occurred more than 10 months earlier. She also stated that whether trauma or scarring occurs depends on the level of force or the number of occasions the child is penetrated. Moreover, actual penetration in a medical sense is not required for a conviction.

Sexual penetration is statutorily defined as:

"[A]ny contact, however slight, between the sex organ of one person and the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration. Evidence of emission of semen is not required to prove sexual penetration." Ill. Rev. Stat. 1989, ch. 38, par. 12—12(f).

In addition, the absence of physical evidence that K.S. was sexually assaulted does not establish that defendant was not proved guilty beyond a reasonable doubt. It is a long-established principle that testimony of even one witness contrary to defendant's testimony is sufficient to convict a defendant. *People v. Novotny* (1968), 41 Ill. 2d 401, 411-12, 244 N.E.2d 182, 188.

The fact finder's conclusions regarding witness credibility and the resolution of disputed questions of fact are entitled to deference on review. *Wittenmyer*, 151 Ill. 2d at 191, 601 N.E.2d at 743; *McCarthy*, 213 Ill. App. 3d at 880, 572 N.E.2d at 1223-24; *Jones*, 174 Ill. App. 3d at 745, 528 N.E.2d at 1369.

K.S.' testimony was sufficiently consistent with earlier reports she made about defendant's sexual assaults. Her reports became more detailed as she was interviewed by various investigators. Relating to strangers how her body was invaded by defendant on numerous occasions over a four-year period would be difficult for any 10 year old.

Defendant also attacks the reliability of K.S.' testimony about these events, directing us to the fact that K.S. could not remember making certain statements to Crooks, Fazio, and Harms. He argues

what she stated at the trial was based only on notes provided to her before she testified.

Any shortcomings in K.S.' testimony cannot be viewed as destroying her credibility. Possible inconsistencies, K.S.' difficulty in responding to defense counsel's questions, and defendant's suggestion that K.S. testified based only on notes provided her by the State affect only the weight to be afforded her testimony by the trier of fact. (*Wittenmyer*, 151 Ill. 2d at 192-94, 601 N.E.2d at 743-44; *McCarthy*, 213 Ill. App. 3d at 880, 572 N.E.2d at 1223; *Booker*, 224 Ill. App. 3d at 550, 585 N.E.2d at 1280.) Defendant was proved guilty of counts I and II beyond a reasonable doubt.

### 2. Counts III and IV

Count III alleged that between March 1985 and June 1987 defendant sexually penetrated the mouth of K.S. with his penis. Count IV alleged that between June 1987 and January 1988 defendant sexually penetrated the mouth of K.S. with his penis. Defendant, Kathy, and K.S. lived at the Illinois Street address between March 1985 and June 1987. Between June 1987 and January 1988 they lived at the Magoun Street address.

K.S. testified that while at the Illinois Street address, defendant "put his private in [her] mouth." She explained his "private" was his penis. She said this happened "more than once" and "all the time." She also testified that at the Magoun Street location, defendant put his penis in her mouth "all the time." This testimony was corroborated by Fazio and Harms.

Although defendant concedes K.S.' testimony was corroborated by Fazio and Harms, he argues the variances in her statements from interview to interview, and the State's leading questions to her during her testimony, make her testimony unreliable. Defendant also argues the evidence established he failed to get his penis into K.S.' mouth. He also contends her testimony about these assaults "ballooned" at trial to a series of assaults which occurred all the time.

K.S.' reports of incidents became more specific as she was interviewed more. When she met with Crooks, her reports were not as specific as when she met with Fazio and Harms. Before meeting with them she was examined by Kidd, to whom she also limited her allegations. It was reasonable for the jury to conclude that K.S.' recounting what defendant had done to her was a natural progression. The more she recounted and spoke about the incidents, the more comfortable she was to tell someone about what happened.

The testimony did not support defendant's argument that he did not put his penis in K.S.' mouth. Fazio testified when K.S. recounted the incident at Illinois Street, she stated defendant tried to get his penis into her mouth, but she turned her head. She then stated he finally accomplished putting his "thing" in her mouth. Harms testified that initially K.S. said defendant was not able to put his penis in her mouth because she covered her mouth. She later admitted, however, that defendant placed his penis in her mouth.

In addition, her testimony did not "balloon" at trial. Throughout her interviews with Fazio and Harms, K.S. indicated the incidents at Illinois Street and at Magoun Street occurred "often" and "all the time."

Her testimony at trial was, at best, difficult for her to experience. Defendant complains because the State gave K.S. notes to read before her testimony. This is called witness preparation and defendant made no objection during the trial. Her statements made during previous interviews helped clarify what occurred between her and defendant. That she was embarrassed to fully recount all the incidents during the trial, in the presence of defendant, a jury, a judge, and perhaps spectators, is understandable. Defendant was proved guilty beyond a reasonable doubt of counts III and IV.

### 3. Count V

Count V alleged that between June 1987 and January 1988 defendant committed an act of sexual penetration of K.S.' vagina with his penis. During this period, defendant, Kathy, and K.S. lived at the Magoun Street address.

K.S. testified that while they lived at the Magoun Street address, defendant would go up and down on her "almost all the time." At times when defendant went up and down on her, she felt his penis touching her private area and could feel his skin touch her skin.

Harms testified K.S. told her that when defendant went up and down on her it hurt. It felt like someone had pinched her real bad. Kidd testified there would be trauma if an adult penis entered the vaginal canal of a girl K.S.' age. However, the statute requires only contact between the sex organ of defendant and the sex organ of the victim, and not full entrance into the vaginal canal.

Defendant argues K.S.' testimony was inconsistent with what she told Fazio and should be viewed as unreliable. K.S. told Fazio, "Gene goes up and down on me." She recounted an incident at the

Magoun Street address where defendant tried to take her clothes off but did not succeed. Defendant rubbed his "thing" on her "private spot" and she tried to get away. Fazio did not ask K.S. whether defendant was clothed during this incident. K.S. did not know how often this occurred.

The State asked a number of questions related to this count. The prosecutor asked if at any time when defendant went up and down on her, she felt his penis touching her "private." K.S. replied, "yes." The prosecutor then asked K.S. if she could feel defendant's skin touching her skin. She replied, "yes."

Defendant incorrectly indicated that while K.S. spoke with Fazio, she recounted only one incident at Magoun Street. She stated she did not know how often this occurred. Harms' testimony supports the allegation that defendant penetrated K.S.' vagina with his penis. K.S. told Harms that when defendant went up and down on her it felt like someone had pinched her real bad. This sensation reasonably intimates skin-to-skin contact between defendant's penis and K.S.' vagina.

Defendant also argues that although K.S. said there was skin-to-skin contact between her and defendant after the State asked her a leading question, this does not establish contact between defendant's penis and K.S.' vagina. The skin-to-skin contact could have occurred anywhere. Witness credibility is for the trier of fact to determine. Its decision is entitled to great weight. (*McCarthy*, 213 Ill. App. 3d at 880, 572 N.E.2d at 1223-24; *Jones*, 174 Ill. App. 3d at 745, 528 N.E.2d at 1369.) Although the evidence of penis to vagina contact was limited, we cannot say that defendant was not proved guilty beyond a reasonable doubt.

### III. EXCESSIVE SENTENCE

Defendant finally argues the five concurrent 30-year terms represent an excessive sentence. He contends the trial judge failed to adequately consider his lack of a prior criminal history, his charitable acts to the community, contributions to his family and friends and other matters presented in mitigation. He asks this court to reduce his sentence accordingly.

We initially note defendant failed to object to his sentence during the hearing and did not file a motion to reconsider or reduce his sentence. He should have brought his concerns to the attention of the trial judge. (See *People v. Sims* (1992), 233 Ill. App. 3d 471, 599 N.E.2d 137.) However, we will consider the merits of defendant's argument.

The sentence imposed by a trial judge is entitled to great deference. (*People v. Streit* (1991), 142 Ill. 2d 13, 18, 566 N.E.2d 1351, 1353; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 884.) Its ruling will not be disturbed absent an abuse of discretion. (*Streit*, 142 Ill. 2d at 19, 566 N.E.2d at 1353; *People v. O'Neal* (1988), 125 Ill. 2d 291, 297-98, 531 N.E.2d 366, 368.) The trial judge did not abuse his discretion.

A sentencing judge is presumed to have considered all relevant factors absent a contrary showing in the record. (*People v. Clark* (1991), 207 Ill. App. 3d 439, 457, 565 N.E.2d 1373, 1385; *People v. Bradney* (1988), 170 Ill. App. 3d 839, 868, 525 N.E.2d 112, 131.) The trial judge stated "I think in considering all of your background and the mitigation, as well as the aggravation that it is an appropriate sentence ***." The record establishes the judge considered all relevant factors.

Defendant persisted in denying his involvement in the conduct of which K.S. complained. The jury concluded he committed the offenses and the trial judge believed there was ample evidence to establish defendant committed the assaults. A defendant's lack of remorse is a proper factor to consider in sentencing. *People v. Ward* (1986), 113 Ill. 2d 516, 528, 499 N.E.2d 422, 426; *People v. McDade* (1991), 219 Ill. App. 3d 317, 331, 579 N.E.2d 1173, 1183.

Defendant directs us to his lack of previous criminal involvement as reason to reduce his sentence. He argues the State inappropriately cites *People v. Hough* (1991), 221 Ill. App. 3d 447, 582 N.E.2d 259, as support for its argument that a trial judge is not bound to impose a minimum sentence when a defendant has no previous criminal record. However, *Hough* is cited for the principle that the court may consider the psychological harm to the victim when determining sentence. *People v. Lafferty* (1990), 207 Ill. App. 3d 136, 138-39, 565 N.E.2d 279, 281, supports the principle defendant wishes us to ignore. We refuse. The trial judge was not bound to impose a particular sentence merely because defendant had a limited criminal record of misdemeanor crimes committed between 1964 through 1969.

Defendant sexually assaulted K.S. repeatedly over a four-year period. The degree of harm caused to a victim can prescribe the severity of the sentence imposed. (*People v. Saldivar* (1986), 113 Ill. 2d 256, 269, 497 N.E.2d 1138, 1143.) The potential for harm to K.S. is greater here than some aggravated criminal sexual assaults because of the duration and extent of defendant's conduct, K.S.' young age and defendant's position of authority over her. His illegal

conduct will continually affect K.S. The presentence report indicates that since the allegations surfaced, K.S. has received weekly counseling for survivors of child sexual assault.

The parties agreed at the sentencing hearing that defendant could have been eligible for an extended term. The State recommended the judge impose a 60-year term. The judge could have ordered defendant to serve his terms consecutively. The sentence imposed was not excessive.

### IV. CONCLUSION

We affirm the trial judge's ruling that the testimony of Crooks, Fazio, and Harms was admissible pursuant to section 115—10 of the Code. Defendant was also proved guilty beyond a reasonable doubt and did not receive an excessive sentence.

Affirmed.

STEIGMANN, P.J., and LUND, J., concur.