NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180194-U

NO. 4-18-0194

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 14, 2020
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS,<br>　　　　Plaintiff-Appellee,<br>　　　　v.<br>ROBERTO PEDRO-FRANCISCO,<br>　　　　Defendant-Appellant. | ) Appeal from the<br>) Circuit Court of<br>) Champaign County<br>) No. 17CF619<br>)<br>) Honorable<br>) Thomas J. Difanis,<br>) Judge Presiding. |

---

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Knecht and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The evidence was sufficient for a reasonable jury to find defendant guilty of aggravated criminal sexual abuse beyond a reasonable doubt.

(2) The trial court's failure to give the jury instruction required by section 115-10(c) of the Code of Criminal Procedure of 1963 (Code of Criminal Procedure) (725 ILCS 5/115-10(c) (West 2016)) after admitting a prior statement by the nine-year-old victim in accordance with section 115-10 did not rise to the level of plain error and trial counsel's failure to object did not constitute ineffective assistance.

(3) The trial court did not violate Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) in admonishing the jury.

¶ 2    In September 2017, the trial court conducted a jury trial on the State's three sexual misconduct charges filed against defendant. The State presented evidence that defendant had sexually abused a nine-year-old neighbor girl. The jury found defendant guilty of one count of aggravated criminal sexual abuse and the court sentenced him to three years in prison.

¶ 3       Defendant filed this direct appeal, raising three claims of error. First, he argues the evidence was insufficient to convict him when the victim's testimony was so inconsistent and improbable that no reasonable jury could have found him guilty beyond a reasonable doubt. Second, defendant claims the trial court committed plain error in failing to instruct the jury pursuant to section 115-10(c) of the Code of Criminal Procedure after admitting the victim's out-of-court statement at trial or, in the alternative, his counsel was ineffective for failing to object. And third, defendant claims the trial court violated Rule 431(b) when it failed to properly admonish each potential juror during *voir dire* of the four constitutional principles essential to a fair trial. After our review of the issues presented, we affirm the trial court's judgment.

¶ 4                                I. BACKGROUND

¶ 5                                A. The Charges

¶ 6       In May 2017, the State filed three counts against defendant, alleging that between January 1, 2017, and May 8, 2017, he committed the following offenses: (1) predatory criminal sexual assault of a child in violation of section 11-1.40(a)(1) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/11-1.40(a)(1) (West 2016)) for committing an act of sexual penetration against E.J., who was under the age of 13, by placing his penis inside her vagina (count I); (2) predatory criminal sexual assault of a child in violation of section 11-1.40(a)(1) of the Criminal Code (720 ILCS 5/11-1.40(a)(1) (West 2016)) for committing an act of contact against E.J. by placing his hand on her sex organ for the purpose of sexual gratification or arousal (count II); and (3) aggravated criminal sexual abuse in violation of section 11-1.60 of the Criminal Code (720 ILCS 5/11-1.60(c)(1) (West 2016)) for committing an act of sexual conduct against E.J. by intentionally touching her vagina for the purpose of defendant's sexual arousal (count III).

¶ 7                                B. Pretrial Motions

¶ 8		Prior to trial, the State filed a motion *in limine*, seeking to admit hearsay testimony of E.J., who was nine years old at the time she made the statements, pursuant to section 115-10 of the Code (725 ILCS 5/115-10 (West 2016)). The State sought to introduce statements E.J. had made to (1) her mother, C.J., on May 8, 2017, (2) Audra Thomas, an examining physician at Carle Hospital, on May 8, 2017, and (3) Mary Bunyard of the Children's Advocacy Center (CAC) on May 10, 2017.

¶ 9		On August 28, 2017, the trial court conducted a section 115-10 hearing. C.J. and Bunyard testified. The court found the time, content, and circumstances of E.J.'s statements to the above-named witnesses provided sufficient safeguards of reliability. The court further found the recorded CAC interview would be allowed into evidence assuming E.J. testified.

¶ 10		C. The Jury Trial

¶ 11		Jury selection began on September 25, 2017. Defendant agreed to be tried by a jury of 6 rather than 12. Once a panel of six jurors was accepted by both sides, the trial court announced:

> "THE COURT: All right. For jurors number 48, 102, 71, 139, 29, and 72, the six of you understand that the defendant is presumed to be innocent of the charges against him. That before the defendant can be convicted, the State must prove him guilty beyond a reasonable doubt. That the defendant is not required to offer any evidence on his own behalf. And that, if the defendant does not testify, that fact cannot be held against him in any way. The six of you understand those instructions; is that correct?
>
> (Jurors respond.)
>
> THE COURT: And they answer in the affirmative. And the six of you will follow those instructions; is that correct?

- 3 -

(Jurors respond.)

THE COURT: Now if [ ] you will, please raise your right hands.

(Jurors sworn.)"

¶ 12      E.J. testified first for the State. She said she had just turned 10 years old in July 2017. She said when she was nine years old, in April or May 2017, she recalled going to the hospital after she had told her mother about something that had happened earlier. She said she knew defendant because he lived in the same apartment building. She said "something happened" between her and defendant "like maybe two or three" times. The first time, she was home with only her two-year-old sister, Lilliana. E.J. was in the bathroom. When she came out, she saw defendant in their apartment. Defendant gave Lilliana a sucker and pushed E.J. into a bedroom. She wanted to scream but he covered her mouth; he was "holding hard." She said he put her on the bed while he took off her pants and then took off his pants. She testified: "He would like for— he was putting his penis on my—I don't know the thing called." She answered in the affirmative to counsel's question whether he put his penis inside of her. She said defendant then left the apartment.

¶ 13      E.J. testified she was scared to tell her family. When asked about the second time defendant abused her, E.J. said she "didn't remember of the second time." E.J. testified when defendant "did these things to [her]," she felt "sad." She said it hurt. She said she did not tell her mother after the second time either. Eventually, she told her mother and then she talked to a doctor, the police, and Bunyard. The prosecutor showed E.J. the anatomical drawings Bunyard had used during their interview. She recalled and confirmed those drawings from the interview. E.J. said she saw "Roberto" in court and said he was "wearing like a black shirt." It is unclear from the transcript exactly why, but the record did not reflect E.J. had identified defendant in court.

¶ 14        The State next called C.J., a native of Guatemala, as a witness with the aid of an interpreter. The prosecutor first had C.J. acknowledge she had been convicted of retail theft in 2015. C.J. testified she had five children ranging in age between 3 and 17 years old, with E.J. being second youngest. She knows defendant as a former neighbor. In April 2017, C.J. said she noticed that E.J. was not eating. She also noticed blood in her pants. C.J. questioned E.J. and E.J. "start[ed] talking about [defendant]." According to C.J., E.J. told her defendant had "raped" her. Because of the blood in E.J.'s pants, C.J. contacted the police, who advised her to go to the hospital. C.J. testified she saw "Roberto" in court, wearing gray. The trial court indicated the record should reflect the witness identified defendant in court.

¶ 15        On cross-examination, C.J. recalled telling the police that E.J. had told her that "these events" happened three days in a row when she was home from school about 20 days prior to May 8, 2017, the day E.J. told C.J. what had happened. C.J. said in April 2017, she noticed E.J. had begun acting differently.

¶ 16        The State's next witness, Dr. Audra Thomas, testified she examined E.J. at Carle Hospital on May 8, 2017. E.J. was accompanied by her mother and a police officer. Dr. Thomas said she was told "there was some concern for sexual assault and the child had been—bloody underwear had been found in the child's closet." Upon examination, Dr. Thomas did not find any evidence of sexual assault, but she explained "there may not be that evidence." The doctor had a discussion with E.J. but, due to language barriers, E.J. had difficulty articulating the exact words when describing what had happened. E.J. was able to point to certain parts of her body.

¶ 17        Dr. Thomas testified:

          "She told me that, that a gentleman had come into the home, had been let in the home by a younger sibling, and that this person had forced her into a bedroom,

taken off his pants and her pants and that he had touched her genital area with his hands and with—she gestured with his parts and she pointed to his groin and so I can only assume from that that she meant his penis."

¶ 18    On cross-examination, Dr. Thomas confirmed she found no outward sign of physical abuse, no blood, no bruises, no lacerations, or any other sign of trauma. On redirect examination, she explained the lack of those indicators did not mean sexual abuse did not happen. She further explained the vaginal tissue generally heals very quickly so, if this occurred 20 days prior, as the parties indicated, the vaginal area would have healed by the time of examination. On re-cross examination, Dr. Thomas acknowledged it was early but possible that a young girl could begin menstruation between ages 9 and 10.

¶ 19    The State next called Isidor Briceno Garcia, a patrol officer with the Champaign Police Department. He testified he was dispatched on May 8, 2017, to an apartment on a sexual-assault report. There, he spoke with C.J., who explained that her daughter, E.J., had described an incident of sexual assault. The officer did not speak with E.J. but transported her and C.J. to the hospital. After his discussions with C.J. and hospital staff, Garcia developed defendant as a suspect. On May 11, 2017, another officer, Detective Benjamin Newell, interviewed defendant while Garcia acted as a translator.

¶ 20    Detective Newell testified he and Garcia, on May 9, 2017, went to the home and spoke with C.J. He arranged for a child advocacy interview on May 10, 2017. After those interviews, he developed defendant as a suspect. On May 11, 2017, the officers located defendant at his place of employment, placed him under arrest, and transported him to the police station. Newell, with Garcia's assistance, interviewed defendant. Defendant tendered his Guatemalan

- 6 -

identification showing a birth date of May 10, 1994. After waiving his rights, defendant denied all allegations.

¶ 21 On cross-examination, Newell indicated he took a pair of E.J.'s gray leggings and a pair of underwear, both with suspected blood and/or vaginal discharge. Newell testified he contacted E.J.'s school to determine what days she may have been absent for multiple days in a row. Defense counsel showed Newell a summary of E.J.'s missed school days between August 2016 to May 2017. Newell was not able to identify multiple days of absences in a row.

¶ 22 The State next called Bunyard as a witness. She testified she conducted a video- and audio-recorded interview of E.J. on May 10, 2017. Bunyard testified she reviewed the DVD recording of the interview and found it to be a true and accurate copy of the interview. In her interview with E.J., Bunyard used anatomical drawings and anatomical dolls to assist E.J. in explaining the incident.

¶ 23 The State played the DVD of the interview for the jury. E.J. stated she was nine years old and was in the fourth grade. Initially, E.J. said she did not know why she was there but then softly said because her neighbor "Roberto" came into their apartment. She explained she was home sick from school. She had gone to the restroom and thought her little sister had let him in. He was sitting on the couch when she came out. "Roberto" gave her little sister a sucker and told her she could play on his phone. He told E.J. to go into the bedroom. E.J. said she told him no because no one else was home. She said he pushed her into her mother's room and pushed her onto the bed. E.J. said she was crying but he covered her mouth with his hand. He began taking off her pants. She said she did not want him to, but he did anyway. He took off his pants but kept his shirt on. She said he was putting his "I-don't-know-what-it's-called" on her. He laid on top of her. E.J. said he must have known when it was time for E.J.'s brother to come home because "he just ran

away." E.J. told Bunyard this happened three times, but she did not remember details of the second or third times. Bunyard could not get E.J. to pinpoint a timeframe of when these three incidents happened in relation to one another. With regard to the second incident, E.J. said only that "Roberto" touched her on top of her clothes. She said the first time he touched her underneath her clothes. He used "something else," not his hand, to touch inside her. She said she was bleeding. Bunyard asked E.J. to demonstrate with the anatomical dolls. E.J. put the male doll on top of the female doll and put his penis inside the female's vagina.

¶ 24　　　　The State rested. Outside the presence of the jury, defendant moved for a directed verdict, claiming the State failed to sufficiently prove defendant's guilt. The court granted the motion with regard to count II but denied the same for counts I and III.

¶ 25　　　　For defendant's case-in-chief, he presented the testimony of Aimee Lee, his supervisor at a restaurant. Lee said in May 2017, defendant worked six to seven days a week, approximately 10 hours per day. On May 11, 2017, Lee met with police, who asked for defendant's work hours. Lee said her employees enter their assigned employee number into a computerized time-keeping system. Lee prepared a document for the police showing when defendant was working during the spring of 2017. (The police had gathered E.J.'s school records and determined there were two days she had been absent: March 29 and April 24, 2017.) Defendant's counsel asked Lee about March 29, 2017. The time records indicated defendant clocked in at 10:24 a.m., clocked out for lunch at 3:30 p.m., clocked back in at 5 p.m., and then clocked out for the day at 10 p.m. On April 24, 2017, defendant clocked in at 8:27 a.m. and clocked out at 3:31 p.m. According to Lee, defendant typically remained at the restaurant for his lunch break because he was provided a free meal.

¶ 26　　　　Defendant chose not to testify. Defendant rested.

¶ 27        After considering the evidence, the jury found defendant not guilty of count I, predatory criminal sexual assault of a child, and guilty of count III, aggravated criminal sexual abuse.

¶ 28        On December 18, 2017, the parties convened for sentencing. First, the trial court heard arguments on defendant's posttrial motion wherein he claimed the evidence was insufficient to convict. The court denied the motion. Next, the court proceeded to sentencing. After considering the presentence investigation report, recommendations from counsel, defendant's statement in allocution, and the statutory factors in aggravation and mitigation, the court sentenced defendant to three years in prison with 222 days' credit for time served.

¶ 29        This appeal followed.

¶ 30                                    II. ANALYSIS

¶ 31                              A. Sufficiency of the Evidence

¶ 32        Defendant claims the State failed to prove him guilty of aggravated criminal sexual abuse beyond a reasonable doubt. He claims E.J.'s testimony was not believable, and there was no physical evidence connecting him to the crime. He claims the evidence was so improbable and unsatisfactory that it created reasonable doubt and thus, his conviction should be reversed.

¶ 33        Section 11-1.60(c)(1) of the Criminal Code (720 ILCS 5/11-1.60(c)(1) (West 2016)) states a defendant "commits aggravated criminal sexual abuse if: (1) that person is 17 years of age or over and: (i) commits an act of sexual conduct with a victim who is under 13 years of age[.]" "Sexual conduct" is defined as "any knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus, or breast of the victim or the accused, or any part of the body of a child under 13 years of age, or any transfer or transmission of semen by the accused upon any part of the clothed or unclothed body of the victim, for the

purpose of sexual gratification or arousal of the victim or the accused." 720 ILCS 5/11-0.1 (West 2016).

¶ 34 The standard for reviewing whether defendant was proved guilty beyond a reasonable doubt is whether, after viewing the evidence most favorably toward the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Back*, 239 Ill. App. 3d 44, 74 (1992). It is not the function of this court to second-guess the credibility determinations of the jury unless we determine no reasonable jury could have come to that same conclusion. *People v. Lara*, 2011 IL App (4th) 080983-B, ¶ 57. As our supreme court has stated, "it is for the fact finder to judge how flaws in part of the testimony affect the credibility of the whole" as long as its judgment is reasonable in light of the record. *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004).

¶ 35 Initially, the State charged defendant with three counts of sexual misconduct, presumably based on E.J.'s initial indication that "something happened" three times. However, her report of the second and third times never came to light. She indicated she did not remember anything about those incidents. The evidence focused solely on the first incident. The question then is whether that evidence, viewed in the light most favorable to the prosecution, was sufficient to find defendant committed aggravated criminal sexual abuse in violation of section 11-1.60(c)(1) of the Criminal Code (720 ILCS 5/11-1.60(c)(1) (West 2016)) for committing an act of sexual conduct against E.J. by intentionally touching her vagina for the purpose of defendant's sexual arousal (count III).

¶ 36 C.J. testified that in April 2017, she noticed E.J. was not acting normal. C.J. noticed E.J. was not eating. Upon C.J.'s questioning, E.J. revealed to C.J. that defendant had "raped" her. C.J. immediately called the police. E.J. then revealed to the doctor at the hospital that defendant

had touched her genital area with his hands and with his penis. The doctor testified E.J. had difficulty expressing herself possibly due to her age but also due to a language barrier. E.J. then revealed to Bunyard during the CAC interview that defendant had touched her inside with his penis by demonstrating with the anatomically correct dolls.

¶ 37     According to the witnesses' testimony, E.J. recounted to each that, while she was in the restroom, her younger sibling allowed defendant to enter the apartment. Defendant gave the younger sibling a sucker and his phone while he forced E.J. into the bedroom and assaulted her. E.J. told Bunyard that defendant held his hand over her mouth as she tried to scream and cry.

¶ 38     The fact that records showed E.J.'s younger sister was at daycare whenever E.J. was home from school and that E.J. did not miss school three days in a row as she had indicated to her mother as to when the abuse had occurred was not fatal to the prosecution's case. As stated, E.J. had difficulty communicating due to a language barrier and had difficulty with the concept of time. For example, E.J. told Bunyard the abuse happened 20 years ago, which is obviously inaccurate. It was clear from the recorded CAC interview that E.J. was uncomfortable discussing the incident and had difficulty expressing herself and describing details. Nevertheless, a reasonable jury could find that E.J. did not come across as untruthful, only that she had difficulty expressing herself.

¶ 39     Additionally, the absence of physical evidence of a sexual assault does not establish that defendant was not proved guilty beyond a reasonable doubt. *Back*, 239 Ill. App. 3d at 76. It is a long-established principle that testimony of even one witness is sufficient to convict a defendant. *Id.* The jury's conclusions regarding witness credibility and the resolution of disputed questions of fact are entitled to deference on review. *Id.*

¶ 40    E.J.'s testimony was sufficiently consistent with earlier reports she had made to others about defendant's sexual assault. She relayed a consistent story to her mother, the doctor, the child-advocacy interviewer, and the jury. Describing the traumatic incident to strangers would be difficult for any 9- or 10-year old but more so when the use of the English language is largely unfamiliar. Any shortcomings in E.J.'s testimony, including the challenged timeline of events, cannot be viewed as destroying her credibility, as possible inconsistencies or any unanswered questions could affect only the weight to be afforded her testimony by the jury. *Id.* at 77. Viewing the evidence in the light most favorable to the State, we find E.J.'s testimony was sufficiently reliable and that any rational trier of fact could have found defendant guilty of aggravated criminal sexual abuse beyond a reasonable doubt.

¶ 41                    B. Jury Instructions

¶ 42    Defendant next contends the trial court erred in admitting E.J.'s out-of-court statements without instructing the jury on how to weigh those statements. Section 115-10(c) of the Code of Civil Procedure specifically requires the court to instruct the jury pursuant to Illinois Pattern Jury Instructions, Criminal, No. 11.66 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 11.66). The State did not tender the instruction; defense counsel did not object or tender the instruction; and the court's instructions did not include it. Defendant acknowledges he did not preserve the error but argues it is reviewable as plain error or, alternatively, that defense counsel was ineffective for failing to offer the instruction or object to the failure to give the instruction.

¶ 43    Section 115-10 allows the admission of hearsay statements in prosecutions for a sexual act committed upon or against a child under the age of 13. Subsection (c) requires:

> "If a statement is admitted pursuant to this [s]ection, the court shall instruct the jury that it is for the jury to determine the weight and credibility to be given the

- 12 -

statement and that, in making the determination, it shall consider the age and maturity of the child, *** the nature of the statement, the circumstances under which the statement was made, and any other relevant factor." 725 ILCS 5/115-10(c) (West 2016).

¶ 44    IPI Criminal 4th No. 11.66 provides the instructions required by section 115-10(c). See IPI Criminal 4th No. 11.66, Committee Note, at 145; *People v. Bryant*, 391 Ill. App. 3d 1072, 1084 (2009).

¶ 45    Here, following a pretrial hearing, the trial court found admissible E.J.'s out-of-court statements made during the CAC interview and allowed the recording of the interview to be published to the jury but did not give the required instruction. The parties correctly agree that the failure to instruct the jury with IPI Criminal 4th No. 11.66 was error. The parties also do not dispute that defendant failed to preserve the error by tendering the instruction himself or raising the failure to give the instruction during sentencing or in his posttrial motion. However, the parties dispute whether this error rises to the level of plain error such that it may be reviewed.

¶ 46    Illinois Supreme Court Rule 366(b)(2)(i) (eff. Feb. 1, 1994) provides that "[n]o party may raise on appeal the failure to give an instruction unless the party shall have tendered it." See also *People v. Sargent*, 239 Ill. 2d 166, 188 (2010). In addition, our supreme court has held: "a defendant will be deemed to have procedurally defaulted his right to obtain review of any supposed jury instruction error if he failed to object to the instruction or offer an alternative at trial and did not raise the issue in a posttrial motion." *Sargent*, 239 Ill. 2d at 188-89 (citing *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007)).

¶ 47    Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors

or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." See *Sargent*, 239 Ill. 2d at 189. The plain error doctrine allows a reviewing court to reach errors that were not preserved when either "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565. Under both prongs of plain error, the burden of persuasion rests with the defendant. *Sargent*, 239 Ill. 2d at 190 (citing *People v. Naylor*, 229 Ill. 2d 584, 593 (2008)).

¶ 48        Both parties agree it was a clear and obvious error to send the case to the jury without the section 115-10(c) instruction. Thus, the question is whether either prong of the plain error test is met such that we may review this unpreserved error. Defendant relies on the first prong and argues the evidence of guilt was closely balanced because the State's case was based solely on E.J.'s testimony.

¶ 49        "Where the defendant claims first-prong plain error, a reviewing court must decide whether the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *People v. Sebby*, 2017 IL 119445, ¶ 51. Prejudice is not presumed. Rather, defendant must demonstrate the error was prejudicial. *Id.* "Prejudice rests not upon the seriousness of the error but upon the closeness of the evidence." *Id.* ¶ 68. "What makes an error prejudicial is the fact that it occurred in a close case where its impact on the result was potentially dispositive." *Id.* Evidence is not considered "closely balanced" whenever the defense's

version of events differs from the State's version and the accounts are equally consistent with the physical evidence. *People v. Lopez*, 2012 IL App (1st) 101395, ¶ 87.

¶ 50 "A reviewing court must undertake a commonsense analysis of all the evidence in context when reviewing a claim under the first prong of the plain error doctrine." *People v. Belknap*, 2014 IL 117094, ¶ 50. A "commonsense" assessment of the evidence in this case leads us to conclude that the evidence was not closely balanced. E.J., a nine-year-old child, told her story at least four times: once to her mother, twice to individual strangers (the doctor and Bunyard), and again in a courtroom filled with people, including defendant. The story remained consistent. It is unlikely E.J. would have revealed such an uncomfortable event if it were untrue. It was not obvious she had been coached, as she had a difficult time expressing herself and identifying parts of the male and female bodies. She initially admitted in her CAC interview she was not sure why she was being interviewed, meaning no one had told her what or what not to say and why. There is no indication E.J. had a motive to lie or exaggerate. Accordingly, our analysis of the evidence reveals it was not closely balanced. Viewing the entire record, we cannot say the evidence was "so closely balanced that the guilty verdict may have resulted from the error." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 51 Defendant has failed to persuade this court that the evidence was so closely balanced that the failure to give IPI Criminal 11.66 "threatened to tip the scales of justice" against him. Therefore, there can be no first-prong plain error. See *Piatkowski*, 225 Ill. 2d at 565.

¶ 52 In reaching this conclusion, we also reject defendant's argument that his trial counsel was constitutionally ineffective for failing to object to the failure to give IPI Criminal 4th No. 11.66 or request the instruction. A claim of ineffective assistance of counsel is governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL

120649, ¶ 29. To establish ineffective assistance of counsel, a defendant must prove that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) he suffered prejudice as a result. *People v. Holt*, 2019 IL App (3d) 160504, ¶ 42. To establish prejudice, the defendant must show that, had counsel's performance not fallen below a reasonable standard of assistance, the outcome of the proceeding would have been different. *Id.* A defendant must satisfy both prongs of the *Strickland* standard, and a reviewing court may proceed directly to the prejudice prong if doing so would resolve a defendant's claim. *Id.*

¶ 53         A reviewing court's analysis of *Strickland* prejudice is similar to the analysis of the first prong of plain error. *Id.* ¶ 43 (citing *People v. Johnson*, 218 Ill. 2d 125, 143-44 (2005)). We have already determined that defendant cannot establish plain error under the first prong; the evidence against defendant was not closely balanced. Accordingly, we hold that defendant cannot satisfy the prejudice prong of the *Strickland* inquiry. See *id.* There is no reasonable probability that the outcome of defendant's trial would have been different had the trial court instructed the jury with IPI Criminal 4th No. 11.66. Therefore, we reject defendant's ineffective assistance of counsel claim.

¶ 54                    C. The *Zehr* Instructions to the Potential Jurors

¶ 55         Under Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), the trial court must admonish each potential juror on four constitutional principles that are essential to a fair trial. Also, the court must ask each potential juror if he or she understands and accepts those principles. These are known as the *Zehr* admonitions and inquiries, named after *People v. Zehr*, 103 Ill. 2d 472 (1984). In the present case, *Zehr* admonitions were given, and *Zehr* inquiries were made. On appeal, however, defendant asserts violations of Rule 431(b).

¶ 56 Defendant acknowledges that, in the proceedings below, he never objected to any noncompliance with Rule 431(b) or asserted an objection in a posttrial motion. "[B]oth a trial objection and a written post-trial motion raising the issue are necessary to preserve an issue for review." *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Nevertheless, defendant seeks to avert the procedural forfeiture by again invoking the doctrine of plain error. He again relies on the first prong of the plain-error doctrine. He maintains that, because the evidence in the trial was "closely balanced," the "clear or obvious" violations of Rule 431(b) "threatened to tip the scales of justice against" him. (Internal quotation marks omitted.) *Sebby*, 2017 IL 119445, ¶ 51. According to defendant, the trial court clearly or obviously violated Rule 431(b) in two ways.

¶ 57 We begin our plain-error analysis by first determining whether any error occurred at all. *Sargent*, 239 Ill. 2d at 189. Defendant claims the circuit court erred by asking the potential jurors if they would "follow" its "instructions" on the *Zehr* principles instead of asking them if they would "accept" those "principles." Defendant argues, under Rule 431(b), the court was supposed to "ask each potential juror, individually or in a group, whether that juror underst[ood] and *accept[ed]*" the *Zehr* principles, not whether that juror understood and would "follow" the *Zehr* principles. Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 58 This court has previously held the language used by the circuit court here was sufficient to comply with the requirement that jurors be asked if they accepted the principles. See *People v. Willhite*, 399 Ill. App. 3d 1191, 1197 (2010) (concluding the trial court complied with Rule 431(b) when it asked jurors if they understood and would follow the four principles). Accordingly, we conclude no error occurred here with regard to the precise terms used by the circuit court.

¶ 59 The second clear or obvious error in the *Zehr* admonitions and inquiries, according to defendant, was lumping the four principles together instead of reciting one principle at a time and asking the potential jurors if they understood and accepted that principle. If indeed this was an error, it was not a clear or obvious one. Nothing in the text of Rule 431(b) clearly requires delivering the admonitions piecemeal with the inquiries interspersed. As defendant admits, the appellate court is divided on the question of whether it is necessary to do so. *Cf. Willhite*, 399 Ill. App. 3d at 1196-97 (this court observed that "Rule 431(b) has no requirement that the trial court ask separate questions of the jurors about each individual principle") and *People v. Hayes*, 409 Ill. App. 3d 612, 627 (2011) (holding that the trial court's admonishments were not compliant because it collapsed the first three principles). Because it was not a clear or obvious error for the trial court to follow *Willhite* over *Hayes*, the procedural forfeiture of this issue will be honored. See *People v. Albea*, 2017 IL App (2d) 150598, ¶ 17.

¶ 60                                III. CONCLUSION

¶ 61          For the foregoing reasons, we affirm the trial court's judgment.

¶ 62          Affirmed.